IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RMR Home Solutions LLC d/b/a ProTaxAppeal and Rick Robin, | Case No. 1:23-CV-07228 Judge: Manish S. Shah Magistrate Judge: Keri L. Holleb Hotaling |
|     Plaintiffs, | |
| v. | |
| Daniel Farris, | |
|     Defendant. | |
| | |
| Daniel Farris, | |
|     Counter-Plaintiff, | |
| v. | |
| RMR Home Solutions LLC d/b/a ProTaxAppeal and Rick Robin, | |
|     Counter-Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiffs RMR Home Solutions LLC d/b/a ProTaxAppeal ("PTA") and Rick Robin ("Robin"), by and through their undersigned counsel, file this First Amended Complaint against Defendant Daniel Farris ("Farris").

**SUMMARY OF THE CASE**

1.      This is a business dispute over the use of software that Farris and PTA have developed together. Farris has wrongfully terminated access to the software and related databases, causing irreparable business harm to PTA.

2.     PTA and Farris entered into an arrangement in 2011 whereby Farris would develop certain software used in PTA's property tax assessment business. PTA paid Farris for his work, and the parties understood that the sole purpose of the software was for PTA's business operations. The software was jointly created by PTA and Farris, with PTA providing, among other things, the foundational materials for the software, requirements, original textual materials that were included in the source code of the software, testing, and instructions for development. Farris was responsible for updating the software at PTA's direction, loading property tax assessment data, and performing other tasks at the direction of PTA.

3.     In the Spring of 2023, Farris began refusing to issue invoices for payments that he expected, which complicated the parties' longstanding arrangement for payment. Despite Farris' lack of cooperation and the disruption of the business arrangement, PTA continued paying. However, Farris began to substantially decrease the work he was doing, and at one point during the difficulties between the parties concerning payment, Farris threatened to sue PTA and Robin for copyright infringement, going so far as to send a draft unfiled complaint for copyright infringement to PTA and to Robin.

4.     PTA, Robin and Farris retained counsel to seek to resolve the situation arising from Farris' failure to perform the required work. Over the summer of 2023, the parties sought to resolve the situation but Farris unilaterally ended these discussions. On August 31, 2023 counsel for Farris sent an email to counsel for Robin, stating that Farris was withdrawing all settlement offers and that Farris would thereafter disable PTA's access to and use of the PTA System.

5.     Concurrently with the termination of settlement discussions, Farris began a campaign of activities designed to disrupt Plaintiffs' business.  On September 1, 2023, Farris

implemented technical measures to completely block PTA from accessing or using the software. Farris has also improperly used his access to PTA's servers to block Plaintiffs from accessing data contained on those servers.

6.     The blocking of the software by Farris is causing irreparable harm to PTA, for which PTA seeks permanent injunctive relief.

## JURISDICTION AND VENUE

7.     This is an action seeking declaratory relief, injunctive relief, money damages and an award of Plaintiffs' costs and attorney's fees.

8.     PTA is an Illinois limited liability company with its principal place of business located in Lake Zurich, Illinois.

9.     Robin is an individual resident of Hawthorn Woods, Illinois.

10.    Farris is an individual resident of Hawthorn Woods, Illinois.

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Copyright Act, 17 U.S.C. § 101 et seq.

12.    This Court has the authority to grant declaratory relief under the Declaratory Judgment Act and this Court's inherent equitable powers. See 28 U.S.C. §§ 2201, 2202

13.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over the Defendant, as he resides in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS COMMON TO ALL CLAIMS

### The Founding of PTA and the Application of Robin's Expertise

16.     Robin established PTA[1] in 2005 to cater to the distinct needs of a market niche concerning real estate property taxes. Robin is the sole member and manager of PTA and is solely responsible for its day-to-day operations as well as its long-term business strategy and tactics.

17.     PTA is a leading property valuation consulting firm with expertise in property tax management, valuations, and appeals. Serving as an advocate for property owners, PTA reviews assessments, manages property taxes, and, when necessary, appeals tax assessments. Each year, it assists thousands of property owners in ensuring fair property taxation, equipping them with vital knowledge and services. Its comprehensive offerings range from basic educational resources to in-depth data research, utilizing advanced software and Robin's seasoned expertise.

18.     Robin used and has continued to use his skills and experience as a homeowner, real estate investor, builder, and engineer to establish and grow PTA's business. Robin's personal quest for an efficient mechanism to supervise, monitor, and control the property taxes associated with his diverse real estate holdings has fueled PTA's development and growth as a company.

19.     Prior to the founding of PTA, Robin's exploration of the property tax space revealed a concerning deficiency. Robin discerned an evident lack in the marketplace of

---

[1] RMR Home Solutions LLC was formed on August 2, 2005 and took on the assumed name ProTaxAppeal in 2012.

independent expertise specializing in property taxes. This results in a daunting set of tasks for the average property owner.

20.     Recognizing the inherent pitfalls of such a system, Robin endeavored to decode the complexities of the property tax system. Drawing from his vast experience spanning real estate, construction, and engineering, he assimilated his newfound knowledge, emerging as a distinguished property tax consultant.

21.     The success and acclaim of PTA have been anchored in Robin's expertise in the space of property tax assessment and the nuanced processes and procedures attached to it. As a homeowner, real estate investor, builder, and engineer, Robin's multifaceted background has presented him with a unique vantage point, allowing him to identify glaring gaps in the property tax system. His relentless pursuit to disentangle these complexities has positioned him as a rarity in this domain, with few matching the depth and breadth of his skill set.

22.     Over the years, Robin's tireless efforts and extraordinary experience have culminated in PTA's distinct and proprietary approach to business. Where the average property owner sees an intimidating maze of governmental procedures, Robin, drawing upon his extensive knowledge, has devised strategies that challenge the status quo, offering clarity and efficiency.

23.     This unique methodology, shaped by years of dedication and insight, has positioned PTA at the forefront of the property tax consultation industry, its success echoing Robin's substantial knowledge and ability.

**Software for PTA's Business**

24.     Central to PTA's operations is its proprietary software tool and related databases, the Property Tax Analysis System (the "PTA System").

25.     Prior to and in 2009, Robin developed an Excel spreadsheet that enabled him to automate much of the process by which PTA could prospect for potential clients for PTA. This spreadsheet and the methodology embodied in it comprises the essential logic and functioning that would later become the PTA System.

26.     The spreadsheet contained original elements, including data fields for real property characteristics selected and arranged by Robin in the course of his work for PTA.

27.     Over the course of three years, from 2009 to 2011, PTA managed property tax appeals for Farris' property, which resulted in several thousands of dollars of savings for Farris.

28.     Following these successful appeals, Farris expressed interest to Robin in understanding the process and methodologies employed. Farris told Robin that prior to 2009, Farris was unaware of the possibility of appealing property tax assessments.

29.     In early July 2011, Robin and Farris met in Robin's home office. In that meeting, Robin provided an overview of the property tax system embodied in the spreadsheet that Robin had developed, including those elements that Robin had selected and arranged.

30.     At that first meeting in 2011, Farris expressed that he would develop for PTA an online beta version of software to incorporate the functionality of the spreadsheet.

31.    On or about July 13, 2011, Robin first provided by email to Farris sales data obtained from the MLS, for use with the software that Robin was directing Farris to develop. Robin continued to provide Farris with MLS sales data to load into the system.

32.    Within a few days after the initial meeting to discuss the software, Farris showed Robin a beta version of the software which was a user interface that allowed client information, property information, and assessment data (as structured in Robin's spreadsheet) to be displayed, stored, and accessible online. All the information to display and store was provided by PTA.

33.    In the following weeks and months, Farris continued to add more information to the beta online system, based on requirements Robin provided to Farris. Robin and Farris communicated by email concerning the development of the PTA System.

34.    Robin continued to provide direction and requirements and other contributions to Farris over the coming years, collaborating with Farris on a frequent basis to develop the software that comprises the PTA System. The PTA System was developed so that PTA could more efficiently fulfill its mission of using Robin's expertise to serve PTA's property owner clients.

35.    Merely by way of example, Plaintiffs provided Farris with the following original content, which Farris incorporated into the source code of the PTA System:

> We have started the appeal process on your behalf by sending a Request for Reduction and Notice of Intent to Appeal (Soft Appeal) to the County/Township Assessor.
>
> The County/Township Assessor has been put on notice that we are representing you, so any correspondence from them should be sent directly to us however we have found this is not always the case and many times the owner of record is contacted instead.

> If you receive any correspondence from the County/Township Assessor, County Board of Review (BOR), or State Property Tax Appeal Board (PTAB) please forward it to us immediately for review. Often there are deadlines to be met so time is of the essence. Failure to do so could result in your appeal being dismissed or your appeal rights waived, however you will still be liable for any appeal fee regardless of appeal outcome.
>
> You should NOT sign any forms unless instructed to do so by us. In most appeals you will not need to take any action and we will do so on your behalf as needed.
>
> The appeal process is slow and usually takes several months after the appeal deadline for your appeal to be decided, but be assured that we are working diligently on your behalf to reduce your assessment by exhausting all your appeal options or until we believe you are fairly assessed. You will receive notification of your appeal results when available, so in the meantime your patience is appreciated.

36.     The content (including the text excerpted above) contributed by Robin to the source code of the PTA System constitutes original work independently created by Plaintiffs and embodies a sufficient degree of creativity to qualify as protectable expression under the Copyright Act, 17 U.S.C. § 102. As such, Plaintiff PTA holds valid and enforceable rights in this content as a copyrightable work. The text reflects Plaintiffs' intellectual effort, skill, and judgment, and is fixed in a tangible medium of expression, making it eligible for copyright protection as a literary work under federal law. Plaintiffs' contribution is distinct, nontrivial, and not dictated by functional necessity or common usage, further establishing its originality and protectability.

37.     Had Robin not provided Farris with content and requirements for the PTA System, on an ongoing basis, Farris would have not been able to contribute any portion at all to the PTA System.

38.     At all times during the development of the PTA System, PTA (through Robin) was the sole decision maker for any and all PTA System modifications or enhancements.

39. Robin has been at all times responsible for the testing of the PTA System to ensure its compliance with PTA's requirements.

40. The software comprising the PTA System resides on servers owned by PTA. However, PTA entrusted Farris with access to and control of the software comprising the PTA System.

41. Farris has provided PTA users who access and use the PTA System with the ability to setup and utilize authentication credentials to access the system.

42. The technical setup for the PTA System is such that PTA does not have access to or control of servers, source code, databases or scripts comprising and used in connection with the PTA System. The arrangement between Farris and PTA provided for Farris to have such access and control.

### Payment to Farris and the Course of Performance

43. PTA has paid Farris for his services. During the first three months in 2011, the consideration provided to Farris was a free 2011 tax appeal conducted for Farris.

44. The first money payment made to Farris was on October 28, 2011 for $2,000.

45. Another payment was made on November 25, 2011 for $2,000.

46. In December 2011, PTA began paying Farris every two weeks for his work, in the amount of $2,000.

47. In February 2012, PTA began paying $4,000 to Farris every two weeks for his work.

48.     In the beginning of 2014, PTA began paying Farris $8,667 per month for his work. Such arrangement continued until June 2023.

49.     The understanding between PTA and Farris is that Farris was being paid for his services. There was no written agreement between the parties that outlined the parties' respective obligations, but Farris was requested to issue invoices to PTA for the work he was providing.

50.     The invoices Farris provided to PTA listed as line items Consulting & Development. See, for example, **Exhibit A**.

51.     There was never any understanding between the parties that any of the payment to Farris was for anything other than the work that Farris was providing on a time and materials basis. More specifically, it was never the intention of the parties that any portion of the payments PTA made to Farris was for as a software licensing fee for the PTA System.

**Farris' Work Stoppage**

52.     From the beginning of the collaboration between Farris and PTA, Farris has been responsible for various technical aspects concerning the operation of the PTA system, including implementing updates to the system and loading in property assessment data, all at the direction of PTA.

53.     In anticipation of the upcoming usual payment due on May 1, 2023 to Farris for his services, Robin, in the middle of April 2023, approached Farris with a request for the provision of an invoice for the services rendered for April 2023.

54.     Despite the legitimate request for an invoice, Farris declined to provide an invoice to Robin.

55.     Instead of adhering to the professional standards of business conduct and the course of performance of the parties, Farris explicitly informed Robin that, absent the payment of $8,667 on May 1, 2023, the PTA System would begin to malfunction progressively.

56.     In response, Robin undertook diligent efforts to secure the required invoice from Farris. These attempts, however, were met with refusal and resistance.

57.     On or around May 3, 2023, Farris took deliberate actions to hamper the operations of PTA's business by discontinuing data downloads and ceasing the functioning of all scripts, crucial for ProTaxAppeal's operations, including the prospecting script instrumental for generating advertising postcards. Such postcards are sent to prospective customers of PTA and are used to develop a "pipeline" of future business for the company.

58.     Recognizing the importance of continuity in business operations, Robin took the initiative on or about June 15, 2023 to draft and generate invoices for both April and May 2023.

59.     Despite the lack of services rendered by Farris in May 2023, Robin, in good faith, paid Farris $8,667 for both April and May 2023, totaling an amount of $17,334.

60.     After the receipt of the aforementioned payment, Farris restarted the data downloads and script operations. However, the delay had already resulted in PTA incurring six weeks of revenue loss and irreparable harm not subject to financial calculation, including reputational loss from the diminution of services provided to PTA's clients.

61.     While Farris did resume services post-payment, Robin, to ensure uninterrupted service and to safeguard the business, initiated the process of transferring some of Farris's responsibilities to another technology professional starting in June 2023.

62.     This new technology professional has been entrusted with crucial tasks including, but not limited to, phone system administration, email administration, and front end web hosting administration related to the PTA System.

63.     On or about July 1, 2023, due to Farris's continued refusal to provide a standard invoice, Robin took upon himself once again to create an invoice for June 2023.

64.     Notwithstanding Farris's limited work for only half of June 2023, PTA made payment of $8,667 to Farris on or about July 1, 2023.

65.     Yet, in a recurring pattern of unprofessional conduct, Farris, on or around July 7, 2023, again halted data downloads and the operation of all scripts, which again resulted in financial harm to ProTaxAppeal due to the cessation of advertising postcards generation. On July 26, 2023, Farris stated via email that he and Plaintiff were "no longer in business".

66.     During this time period (June through August 2023), both parties engaged in negotiations through their respective counsel in an attempt to amicably resolve the arising disputes.

67.     However, the hopes of an amicable resolution were quashed when Farris unilaterally terminated the settlement negotiations on August 31, 2023. On the evening of August 31, 2023 counsel for Farris sent an email to counsel for Robin, stating that Farris was withdrawing all settlement offers and that Farris would thereafter disable PTA's access to and use of the PTA System. See **Exhibit B**.

68.     On September 1, 2023, Farris took the extreme step of shutting down the entire PTA System, resulting in complete operational paralysis. See **Exhibit E**.

69.     Based on Farris' familiarity with PTA's business operations and the functions of the PTA System, in particular that the PTA Software enabled PTA to provide services to PTA's clients and to meet applicable deadlines in the property tax assessment proceedings, Farris intentionally took these actions to damage and otherwise interfere with PTA's business operations.

70.     Farris knows that PTA does property tax appeals for the benefit of property owners whose tax assessments are perceived to be higher than they should be. And he knows how PTA generates money – the PTA System, among other things, generates documents for PTA's use in the property tax appeal process, and PTA is paid a fee based on the amount of property tax savings procured for its clients.

71.     Farris' actions have caused and are continuing to cause severe and irreparable harm to PTA.

72.     Without access to and use of the PTA System, PTA could no longer operate and was effectively shut down. The company had no means to access any client information or documents needed to file new appeals and cannot meet deadlines for pending appeals. Missing a deadline on a pending appeal means the appeal may be dismissed, making PTA potentially liable to its clients.

73.     The inability to access and use the software meant that many of PTA's clients were unable to successfully appeal their property tax assessments. This caused PTA to lose revenue and placed PTA at risk of legal liability to its clients and made it subject to substantial potential

damages. Moreover, it subjected PTA to terrible reputational harm, which is irreparable, in the relevant industry.

**Farris' Legal Threats**

74.     On June 22, 2023, counsel for Farris sent an email to PTA and Robin, together with an unfiled draft complaint against PTA and Robin alleging copyright infringement. See **Exhibit D**.

75.     The email accompanying the draft complaint clearly indicated that if PTA and Robin would not agree to Farris' proposed settlement terms, then the filing of the complaint would follow. *Id*.

76.     Among other things, Farris alleged in the draft complaint that:

    (i)      he is the exclusive owner of all copyright rights in the PTA System;

    (ii)     PTA was paying for the use of the PTA System;

    (iii)    PTA was using the PTA System without Farris's authorization or consent;

    (iv)     the PTA System was not created by PTA or Farris; and

    (v)      PTA or Robin did not specifically order or commission the PTA System.

77.     None of the assertions set forth in the preceding paragraph are true, and Plaintiffs dispute each and every one of these assertions.

78.     Farris is not the exclusive owner of all copyright rights in the PTA System because the PTA System is a joint work under the Copyright Act. PTA and Farris created the PTA System together with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. Among other things, Robin provided materials, text, instructions,

requirements and other information and parameters by which Farris was required to play his role in the generation of the PTA System.

79.     Alternatively, if PTA and Farris are not joint owners of the PTA System, then PTA's use of the software is not infringing because Farris granted PTA an irrevocable implied license to use the PTA System.

80.     PTA specifically requested and directed that Farris create the PTA Software. Before the initial meeting between Farris and Robin in 2011, Farris had no reason to create the PTA System. PTA would not have provided information and collaboration with Farris had PTA not given the go-ahead to Farris to create the software. There is no reason for the software to have been created other than to serve the need and direction of PTA.

81.     Upon the direction of PTA, Farris created the PTA System and delivered it to PTA for PTA's exclusive use. The parties knew this was the intended purpose and use of the PTA System. This is clear from correspondence between the parties, invoices generated and delivered, and the course of conduct of the parties for more than a decade. Farris provided the PTA System to no party other than PTA. The PTA System was installed and maintained on servers owned by PTA and implemented in PTA's place of business.

82.     The course of conduct of the parties, along with innumerable conversations via written and spoken word, demonstrate that Farris intended PTA to exercise the right to access, execute and otherwise use the PTA System installed on PTA's servers.

### COUNT I: DECLARATORY JUDGMENT OF
### NON-INFRINGEMENT OF COPYRIGHT

83.     Plaintiff repeats and incorporates by reference the preceding paragraphs.

84. An actual case or controversy exists between the parties, in that Farris has made assertions that Farris owns the intellectual property rights in the PTA System and that PTA and Robin have infringed those rights. Those assertions are false.

85. Instead, PTA and Robin are fully availed to the full enjoyment of rights granted under the Copyright Act to, among other things, reproduce, distribute, display and create derivative works of the PTA System because PTA and/or Robin are joint owners of the copyright rights in the PTA System with Farris.

86. Alternatively, because of the nature of the relationship between the parties, evidenced through documents, conversations and conduct, PTA and/or Robin are fully availed to the full enjoyment of rights granted under the Copyright Act to, among other things, reproduce, distribute, display and create derivative works of the PTA System under an irrevocable implied license in the PTA System.

**COUNT II: BREACH OF CONTRACT: IRREVOCABLE IMPLIED LICENSE**

87. Plaintiff repeats and incorporates by reference the preceding paragraphs.

88. Farris granted to PTA and/or Robin an irrevocable implied license to enjoy full use of the PTA System.

89. Such granting of a license constitutes an enforceable agreement.

90. By depriving PTA of access and use of the PTA System, Farris has breached the agreement (irrevocable implied license), causing damage to PTA.

## COUNT III: TORTIOUS INTERFERENCE

91.     Plaintiffs repeat and incorporate by reference the preceding paragraphs.

92.     Farris was aware of the existence of PTA's business relationships with its clients and prospective clients, including PTA's reliance on the PTA System to fulfill obligations and maintain those relationships.

93.     PTA relies on the PTA System to perform property tax assessment appeals, meet deadlines, and provide vital services to its clients. Disruption of the PTA System directly impedes Plaintiff's ability to meet its professional obligations and damages its reputation in the property tax industry.

94.     Farris intentionally and without justification disabled Plaintiffs' access to the PTA System and engaged in other conduct designed to interfere with Plaintiffs' ability to perform their business functions. These actions were specifically calculated to harm Plaintiffs' relationships with existing and prospective clients.

95.     As a direct and proximate result of Farris' wrongful conduct, Plaintiffs have been unable to meet critical deadlines in property tax appeals, leading to client dissatisfaction, loss of business opportunities, and irreparable harm to their reputation. Moreover, Plaintiffs were unable to effectively market PTA's services because it was unable to generate postcards for use in marketing PTA's services. Plaintiffs have also incurred significant operational disruption, financial harm, and other damages.

96.     Farris' actions constitute tortious interference with Plaintiffs' business relationships, as his conduct was malicious, willful, and undertaken with the intent to harm Plaintiffs' business.

97.     Because of Farris' tortious interference, PTA suffered damages, the amount of which will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter an Order finding that neither Plaintiff has infringed the copyright in the PTA System;

(b)     Award Plaintiffs monetary damages to be proven;

(c)     Grant injunctive relief, preventing Defendant from unlawfully withholding access to the PTA System software from Plaintiffs;

(d)     Award Plaintiffs attorneys' fees and costs as provided by statute; and

(e)     Grant such other and further relief as the Court deems just and proper.

[Continued on following page]

Plaintiffs demand a trial by jury.

Dated: January 23, 2025         Respectfully submitted

/s/ Evan D. Brown

Jeffrey T. Norberg (jnorberg@nealmcdevitt.com)
Evan D. Brown (ebrown@nealmcdevitt.com)
Richard B. Biagi (rbiaigi@nealmcdevitt.com)

Neal & McDevitt LLC
2801 Lakeside Drive, Suite 201
Bannockburn, IL 60012
Phone: (847) 881-2460
Fax: (847) 441-0911

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on January 23, 2025 he caused the foregoing First Amended Complaint to be served on all parties registered to receive notice in this case through the ECF system.

/s/ Evan Brown